**J. Refugio GARCIA–GUZMAN,**
**Petitioner,**

v.

**Janet RENO, et al., Respondents.**

**No. C 99–2727 TEH.**

United States District Court,
N.D. California.

Sept. 1, 1999.

Lamar Peckham, Santa Rosa, CA, for petitioner.

Robert Yeargin, U.S. Attorney's Office, San Francisco, Christine A. Bither, U.S. Department of Justice, Washington, DC, for respondents.

### ORDER GRANTING WRIT OF HABEAS CORPUS

HENDERSON, District Judge.

#### I. FACTUAL AND PROCEDURAL BACKGROUND

Mr. Garcia–Guzman is a sixty-four year old citizen and national of Mexico who moved to the United States as a lawful permanent resident in 1967. On July 12, 1995, petitioner was convicted of assault with a deadly weapon in violation of California Penal Code § 245(a)(1). On March 20, 1997, he was convicted and sentenced to two years, eight months, for driving under the influence of alcohol in violation of California Vehicle Code § 23152(a) and inflicting corporal injury on a spouse or

cohabitant in violation of California Penal Code § 273.5(a). While serving out his prison sentences petitioner had surgery for throat cancer. His larynx was removed and he has since been unable to speak. Petitioner also suffers from arthritis, kidney problems and requires medication.

Presumably in anticipation of removal proceedings, petitioner retained current counsel, Mr. Lamar Peckham, who filed a Form G–28 notice of entry of appearance of counsel with the Immigration and Naturalization Service ("INS") in San Francisco on December 9, 1997. In a letter submitted with the Form G–28, counsel noted petitioner's health problems and specifically requested that he not be transported outside of northern California for removal proceedings. Counsel also emphasized that, because of petitioner's throat surgery, "it is impossible to maintain attorney-client communication over the telephone." Certified Administrative Record ("AR") 149. On January 23, 1998, the INS "issued" but failed to serve a Notice to Appear, stating that petitioner was removable pursuant to sections 237(a)(2)(A)(ii) & (iii) of the Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1227(a)(2)(A)(ii) & (iii) (covering crimes involving moral turpitude and aggravated felonies). AR 164–66. On June 10, 1998, petitioner was taken into the custody of the INS from Centenella State Prison and two days later, the INS finally served him with the Notice to Appear. However, the Notice to Appear did not indicate the time and place for petitioner to appear for removal proceedings and it was not forwarded to petitioner's counsel.

It took counsel until June 17, 1998, to determine that petitioner was being detained by the INS in El Centro, California, and that the Notice to Appear had still not been filed with the Immigration Court because no judges were available. The following day, counsel filed a motion for change of venue with the Immigration Court in El Centro, along with another Form G–28, but the motion was returned on June 30, 1998, because no Notice to Appear had been filed with the court. Inexplicably, and without notice to counsel, the INS then moved petitioner to Seattle, Washington. On July 13, 1998, the INS informed the Seattle Immigration Court that petitioner was in custody there, AR 167, and on July 15, 1998, the INS filed the Notice to Appear.

Counsel for petitioner was not informed of petitioner's whereabouts until July 20, 1998, the very day his removal proceedings were set to begin in Seattle. After attempting to initiate proceedings and discovering that petitioner was mute, the Immigration Judge ("IJ") queried whether petitioner had counsel. Petitioner responded by nodding and indicated that he would like to have Mr. Peckham contacted. AR 48. Once raised on the telephone, Mr. Peckham immediately remarked that he was "astonished" to learn that petitioner had been moved to Seattle and stated that he would file a motion for change of venue. AR 49. In response, the IJ advised counsel that it was her practice to deny motions for change of venue ·for detained aliens unless the INS agreed:

| Judge: | But I just want to let you know Mr. Peckham, that I don't normally grant motions for a change of venue unless the Service—with two exceptions. One is that the client admits and conceded to his removal and tells the Court what relief he's going to apply, and secondly would be if the Service would be. Because he is in detention being held by the INS, I cannot tell the INS to transfer to another district. Just so you understand what the process is of this Court. |
|---|---|
| Mr. Peckham: | Yes, but that's not even the district he was—I mean, I can't understand why he is in Seattle at all. |
| Judge: | I don't know what they do, Mr. Peckham, but I do know that we have been receiving a lot of California prisoners, and they've just been transferring any which way they can get them. I know of cases in Anchorage, Alaska, that the people have been transferred from Anchorage to Arizona, and their case is still in Anchorage. So I cannot help you there. |
| Mr. Peckham: | Right. |
| Judge: | But he is here, and as I told you earlier, there are only two circumstances under which I do grant changes of venue. Just so that it's clear, do you want me to continue this case for two days or a week? |

Mr. Peckham:    A week, please.

Judge:    Okay. . . .

AR at 50. The IJ then granted a continuance until August 3, 1998, and asked counsel to enter an appearance by filing another G–28.

On July 22, 1998, petitioner's counsel filed for a change of venue, citing the impossibility of conferring with his client by telephone or paying for travel to Seattle to appear in person, the due process protections regarding petitioner's right to counsel, the fact that the INS had repeatedly transferred petitioner without notice to counsel, and the inherent inadequacy of appearing by telephone since petitioner would be unable to communicate with him. AR 142–47. The IJ summarily denied the motion on the following day, stating only that "Respondent is in INS custody. If INS in San Francisco and Seattle agree to transfer Respondent to San Francisco, the Motion may be granted. Otherwise, this Court cannot force the INS to move a detained individual. Counsel may appear by telephone." AR 141. The INS had no opportunity to respond to the motion.

Counsel for petitioner immediately moved the IJ to reconsider, citing authority for the proposition that even if the place of detention is beyond the authority of an IJ to change, the place where hearings are held can be determined by an IJ. AR 72–73. The INS filed an opposition, arguing that "the privilege of appearing telephonically for master calendar hearings" is sufficient for petitioner's attorney and witnesses and that "[i]f respondent is found removable as charged there is little likelihood of any available relief and the need for an individual hearing." AR 131. Tracking the INS's opposition, the IJ denied the motion to reconsider on the grounds that petitioner failed to provide "evidence that INS in San Francisco had space to keep the respondent. Furthermore, there is no evidence that INS in Seattle, Washington is willing to transfer respondent." AR 129–30. Finally, the IJ noted that "if the Court were to grant a change of venue, the Court is indirectly ordering the INS to transfer respondent to San Francisco." *Id.* Thus the IJ concluded that Petitioner's right to counsel was not interfered with because Mr. Peckham could appear telephonically, or travel to Seattle since "[i]t is a well-known fact that many attorneys travel from State to State to represent their clients." *Id.* Petitioner filed an interlocutory appeal with the BIA, but the court refused to entertain the appeal since "questions of venue are within the jurisdiction of the Immigration Judge." AR 69.

At the August 3, 1998 hearing Mr. Peckham again appeared by telephone and indicated that he was not ready to proceed because he had still not received a copy of the Notice to·Appear. AR 54. The judge promised to send a copy of the Notice to Appear along with an "evidence packet" and granted another continuance of the removal hearing to August 13, 1998, informing counsel that she expected him "to be ready to proceed on that date." AR 55. On the 13th the IJ attempted to proceed, however, the difficulties created by petitioner's inability to speak combined with Mr. Peckham's inability to appear personally and inadequate time to prepare or consult with his client derailed the hearing. Petitioner attempted to submit a written statement in Spanish which the Judge refused to have translated. AR 57–58. Mr. Peckham then stated that he had only received the NTA five days before the hearing, that he had received written communication from his client which he was trying to respond to, and that all of their efforts to communicate with each other were slowed by petitioner's inability to speak. The IJ then granted a third continuance to August 19, 1998, noting that it would be the last. AR 59.

The hearing went forward on the 19th with petitioner again nodding or shaking his head to respond to questions. AR 63. Mr. Peckham admitted that he had received the NTA, sent petitioner a copy, and explained it to him. The IJ then held that petitioner was removable, finding that the INS had proved all the requisite allegations. The IJ gave counsel through

September 10, 1998, to file a brief outlining any possible grounds for relief from deportation. No brief was filed on petitioner's behalf, so on the 10th of September the IJ ruled on the merits that petitioner's felony convictions were particularly serious crimes which rendered him ineligible for relief from deportation. AR 34. Petitioner appealed to the BIA. Just before the BIA dismissed his appeal on May 26, 1999, petitioner was released on his own recognizance due to his deteriorating health.

Petitioner filed the instant action on June 9, 1999, fearing imminent removal to Mexico. However, the INS agreed not to remove petitioner immediately after the BIA's ruling and the parties stipulated to move the hearing date into August. Until the Court issued its notice of intended ruling, petitioner was under orders from the INS to report for removal on the morning of August 16, 1999.

## II. DISCUSSION

### A. Standing

The government contends that petitioner lacks standing because, even assuming his statutory and due process rights were violated, he does not contest the factual predicate for his order of removal or his ineligibility for relief from deportation. Thus, his alleged injuries—a procedurally defective removal proceeding and violation of his right to counsel—are not redressable. As the government argues: "On the evidence before the Court, there could be no different result than that already rendered by the immigration judge and the Board. . . . The prospect that petitioner would obtain relief from the injury of deportation as a result of a favorable ruling by [this] Court is too speculative to warrant the exercise of judicial review." Resp. Opp. Mem. at 4–5.

As the government notes, the Supreme Court has held that redressibility is an essential element of standing. *See Northeastern Florida Chapter of the Associated General Contractors v. Jacksonville*, 508 U.S. 656, 663–64, 113 S.Ct. 2297, 2301–02, 124 L.Ed.2d 586 (1993) ("It has been established by a long line of cases that a

party seeking to invoke a federal court's jurisdiction must demonstrate . . . a likelihood that the injury will be redressed by a favorable decision, by which we mean that the 'prospect of obtaining relief from the injury as a result of a favorable ruling' is not 'too speculative.'") (quoting *Allen v. Wright*, 468 U.S. 737, 752, 104 S.Ct. 3315, 3325, 82 L.Ed.2d 556 (1984)). Here the BIA affirmed the immigration judge's finding of removability after noting that petitioner did not offer evidence to challenge the authenticity of the felony conviction documents submitted by the INS. The IJ also found that petitioner was not eligible for any form of relief from deportation under the INA as a result of his felony convictions.

■ However, the government assumes that the only injury petitioner suffers as a result of the alleged violation of his right to counsel is removal. This is not the case. Indeed, according to the government's argument, removal is an injury that would have occurred irrespective of whether petitioner's right to counsel was violated. The real injury here is procedural, and, as such, it is not inextricably bound up with the ultimate outcome of petitioner's removal proceedings. Due process and the right to counsel are recognized and protected not merely for the reason that they help ensure accurate outcomes, but for the additional and equally important reason that they provide individuals subject to the coercive force of the state with tools necessary to understand and participate in proceedings that will determine their fate. If petitioner can show that his right to counsel was violated, his injury was deprivation of meaningful access to counsel as guaranteed by the INA and due process. This injury is clearly redressable by vacating the order of removal and allowing petitioner to remain in the country until such time as removal proceedings are conducted in a manner consistent with his right to counsel.

### B. Jurisdiction

The Government presents three arguments against this Court's jurisdiction.

First, the government incorrectly claims that the Court is bereft of jurisdiction under INA § 242(g), as amended by § 306(a) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub.L. 104–208, 110 Stat. 3009 (1996), which provides as follows:

> Except as provided in this section and notwithstanding any other provision of law, no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under [the INA].

8 U.S.C. § 1252(g). In *Reno v. American–Arab Anti–Discrimination Committee*, 525 U.S. 471, 119 S.Ct. 936, 142 L.Ed.2d 940 (1999), the Supreme Court confirmed that section 242(g), 8 U.S.C. § 1252(g), is limited in scope and does not, therefore, preclude habeas review of all aspects of removal proceedings. The Court held that the provision applies only to "three discrete actions the Attorney General may take: her 'decision or action' to 'commence proceedings, adjudicate cases, or execute removal orders.'" 119 S.Ct. at 943.

The government nevertheless attempts to force this case into the bounds of § 1252(g) by arguing that petitioner's case "challenges both the Attorney General's adjudication of his case and her decision to execute the order of removal." Resp. Opp. Mem. at 7. However, petitioner's claims go to questions of law regarding the manner and method by which his removal proceedings were handled rather than discretionary decisions or actions covered by § 1252(g). Specifically, petitioner challenges the IJ's conclusion that she could not order a change of venue without approval from the INS, the INS's failure to notify counsel of changes in petitioner's place of detention, and the INS's decision to conduct removal proceedings in a location that interfered with his constitutionally protected attorney-client relationship.

The government's rejoinder is that the decisions petitioner challenges are *part of the process* of "adjudicating cases," and are therefore exempt from review. The language of § 1252(g) is simply ambiguous as to whether only the initial decision or action to adjudicate a case is covered or whether all decisions and actions in the process of adjudication are covered. However, *American–Arab* and subsequent lower court rulings clarify that "adjudicate" does not, perforce, reach all decisions and actions in the process of adjudicating cases. In *American–Arab*, the Supreme Court was careful to note that Congress had a specific purpose in focussing on decisions or actions to "commence proceedings, adjudicate cases and execute removal orders," rather than precluding judicial review of all stages of the deportation process:

> There was good reason for Congress to focus special attention upon, and make special provision for, judicial review of the Attorney General's discrete acts of "commencing proceed[ings], adjudicat[ing] cases, [and] execut[ing] removal orders"—*which represent the initiation or prosecution of various stages in the deportation process.* At each stage the Executive has discretion to abandon the endeavor, and at the time IIRIRA was enacted the INS had been engaging in a regular practice (which had come to be known as "deferred action") of exercising that discretion for humanitarian reasons or simply for its own convenience.

119 S.Ct. at 943 (emphasis added). Apparently, "the INS's exercise of this discretion opened the door to litigation in instances where the INS chose not to exercise it." *Id.* at 944. Thus, as the Court concluded, "[s]ection 1252(g) seems clearly designed to give some measure of protection to 'no deferred action' decisions and similar discretionary determinations . . . ." *Id.*

To confirm the narrowness of section 1252(g), the Court also listed examples of "many other" decisions or actions that are part of the deportation process *but never-*

*theless fall outside section 1252(g)'s reach. Id.* at 943 ("the decisions to open an investigation, to surveil the suspected violator, to reschedule the deportation hearing, to include various provisions in the final order that is the product of the adjudication, and to refuse reconsideration of that order"). These examples all cover decisions and actions that could arguably be construed as part of the decision to commence proceedings or adjudicate cases. Thus § 1252(g) is properly read to cover only the three discrete actions enumerated therein.

The Sixth Circuit recently reached the same conclusion in considering a habeas petition by aliens subject to deportation who alleged ineffective assistance of counsel. *Mustata, v. Department of Justice,* 179 F.3d 1017 (6th Cir.1999). The district court dismissed the petition on the grounds that § 1252(g) eliminated its jurisdiction over the case. The court of appeals reversed, noting first that "[b]ecause some of the examples [listed in *American–Arab* ] could be squeezed into one of the three listed actions if the actions were to be read expansively, the examples reinforce the Court's express statement that § 1252(g) 'applies only to three discrete actions' and its description of its reading of § 1252(g) as a 'narrow' one." *Mustata,* 179 F.3d 1017, 1021 (quoting *American–Arab,* 119 S.Ct. at 943, 945). The court then held that the petition could not be construed "as a challenge to a decision or action to 'adjudicate cases' ":

> While the claim arises out of the February 1996 hearing at which they agreed to drop their asylum claim in exchange for voluntary departure, the Mustatas are not challenging the Attorney General's decision to adjudicate their case. *They are not claiming that the Attorney*

General should have exercised her discretion to not adjudicate their case and grant them "deferred action."

*Id.* at 1022 (emphasis added). Here, just as in *Mustata,* petitioner is not claiming that the INS should have granted him "deferred action" before adjudicating his case—instead he challenges the statutory and constitutional foundation for other decisions made during his removal proceedings. *See also id.* (holding that petitioners' "claim is not one to the Attorney General's decision or action to *execute* a removal order" either since the "facts relevant to their claim ... took place well before any decision by the Attorney General to execute a removal order") (emphasis added). Thus the government's construction of § 1252(g) simply flies in the face of *American–Arab* and its progeny.

■ The government next argues that this Court lacks jurisdiction because petitioner failed to exhaust direct review. According to 8 U.S.C. § 1252(b)(2), judicial review of deportation orders is limited to the court of appeals. Because petitioner failed to appeal the BIA's decision to the Ninth Circuit, the government believes that petitioner is not eligible to pursue habeas relief before this Court. The government's brief blends this claim with the equally mistaken argument that the district courts are categorically precluded from hearing direct or collateral attacks on orders of removal. In *Goncalves v. Reno,* 144 F.3d 110 (1st Cir.1998), the First Circuit rejected the same arguments.[1] Like petitioner here, Goncalves filed for habeas relief in the district court without first pursuing a direct appeal to the circuit court because applicable provisions of the INA bar aliens with aggravated felonies from seeking review in the courts of appeals. *See* 144 F.3d at 114–15.[2] The First

1. On the same day that the Supreme Court ruled in *American–Arab,* it denied certiorari in *Goncalves. See Reno v. Goncalves,* —— U.S. ——, 119 S.Ct. 1140, 143 L.Ed.2d 208 (1999).

2. Goncalves was subject to a "transition period" rule which precluded appeal to the circuit court; Guzman is subject to an essentially identical permanent provision enacted as

part of IIRIRA. *See* IIRIRA § 306(a)(2)(C) ("Notwithstanding any other provision of law, no court shall have jurisdiction to review any final order of removal against an alien who is removable by reason of having committed a criminal offense covered in section 1227(a)(2)(A)(iii) ... or any offense covered

Circuit held (1) that there is no jurisdiction in the courts of appeals over claims by aliens deportable by reason of having committed specified criminal offenses, *id.* at 117–18; and (2) that § 1252(g) cannot be read to work a repeal of habeas jurisdiction by implication. *Id.* at 119 ("If Congress intends to repeal or restrict habeas jurisdiction under § 2241, it must say so explicitly."). The First Circuit is not the only court to reach this conclusion. *See Sandoval v. Reno*, 166 F.3d 225, 237–38 (3rd Cir.1999); *Henderson v. INS*, 157 F.3d 106, 117–122 (2d Cir.1998), *cert. denied*, —— U.S. ——, 119 S.Ct. 1141, 143 L.Ed.2d 209 (1999); *Mendoza–Guerra v. Reno*, No. C 99–0879 SI, 1999 WL 360748, \*3–4 (N.D.Cal. June 1, 1999) (noting agreement with other district courts in the Ninth Circuit); *Coronel v. Reno*, No. C 99–0721 TEH (N.D.Cal. May 25, 1999).

Finally, the government contends, oddly under the heading of a jurisdictional challenge, that petitioner must make out his case for a stay of removal by clear and convincing evidence, rather than the traditional equitable standard applicable to requests for provisional injunctive relief. According to INA § 242(f)(2), "no court shall enjoin the removal of any alien pursuant to a final order under this section unless the alien shows by clear and convincing evidence that the entry or execution of such order is prohibited as a matter of law." 8 U.S.C. § 1252(f)(2). Although the government asserts that petitioner cannot meet this heightened standard, their argument is irrelevant as far as jurisdiction is concerned. In any event, as the discussion below reveals, petitioner's case merits relief by any standard.

## C. The Merits

■ To obtain a writ of habeas corpus under 28 U.S.C. § 2241, petitioner must demonstrate that he "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3). Petitioner is considered to be "in custody" for the purposes of this statute because he is subject to a final order of removal. *See Nakaranurack v. United States*, 68 F.3d 290, 293 (9th Cir. 1995).

Petitioner's principal argument on the merits is that the INS interfered with his attorney-client relationship in violation of the INA, applicable regulations and the Due Process Clause of the Fifth Amendment. He claims (1) that he was detained on the basis of a defective Notice to Appear without notice to counsel, (2) that he was moved to Seattle where removal proceedings were initiated without notice to counsel and conducted in a manner that precluded consultation with and effective representation by counsel, and (3) that he was improperly denied a change of venue which would have eliminated any interference with his attorney-client relationship.[3]

■ Up to a point, the case law in the Ninth Circuit is fairly clear. First, it is well established that while aliens have no right to counsel under the Sixth Amend-

---

by section 1227(a)(2)(A)(ii) ...."), codified at 8 U.S.C. § 1252(a)(2)(C).

Oddly, the government acknowledges that "[t]he Act restricts judicial review in criminal alien cases," Resp. Opp. Mem. at 8 (citing 8 U.S.C. § 1252(a)(2)(C)), but nevertheless insists that the court of appeals has "jurisdiction to determine whether a predicate legal requirement for a finding of deportability has been satisfied [and therefore] could have considered petitioner's constitutional and statutory arguments ...." *Id.* at 8–9. This is a red herring. Although the Ninth Circuit has exercised jurisdiction to determine, *ab initio*, whether offenses committed by certain aliens qualify as "aggravated felonies" within the

meaning of the provisions that eliminate judicial review for criminal aliens, *see* 8 U.S.C. § 1105a(a)(10), repealed and replaced by 8 U.S.C. § 1252(a)(2)(C), there is no question in this case that petitioner's underlying offenses fall within the scope of § 1252(a)(2)(C). *Cf. Coronado–Durazo v. INS*, 123 F.3d 1322, 1323 (9th Cir.1997); *Valderrama–Fonseca v. INS*, 116 F.3d 853, 855 (9th Cir.1997); *Abdel–Razek v. INS*, 114 F.3d 831, 832 (9th Cir.1997).

3. Petitioner also complains that the IJ improperly considered his request for release on bond along with the merits of the removal proceeding and that the IJ did not inform him of the reasons for denying bond.

ment, "[a]n alien is entitled to due process under the Fifth Amendment in his deportation hearing." *Rios–Berrios v. INS*, 776 F.2d 859, 862 (9th Cir.1985) (citing *United States v. Barraza–Leon*, 575 F.2d 218, 220 (9th Cir.1978)). As the Supreme Court has observed:

> We are dealing here with procedural requirements prescribed for the protection of the alien. Though deportation is not technically a criminal proceeding, it visits a great hardship on the individual and deprives him of the right to stay and live and work in this land of freedom. That deportation is a penalty—at times a most serious one—cannot be doubted. Meticulous care must be exercised lest the procedure by which he is deprived of that liberty not meet the essential standards of fairness.

*Bridges v. Wixon*, 326 U.S. 135, 154, 65 S.Ct. 1443, 1452, 89 L.Ed. 2103 (1945).

■ Second, "aliens are entitled *by statute and regulation* to certain specified procedural protections. In particular, they have the right to be represented by counsel of their choice, at no expense to the government ... [and] they are guaranteed a reasonable opportunity to present evidence in their own behalf." *Baires v. INS*, 856 F.2d 89, 91 (9th Cir.1988) (emphasis added) (citing *Castro–O'Ryan v. United States Dep't of Immigration and Naturalization*, 847 F.2d 1307, 1312 (9th Cir.1987); *Colindres–Aguilar v. INS*, 819 F.2d 259, 260–61 n. 1 (9th Cir.1987); 8 U.S.C. §§ 1252(b) and 1362 (1982); 8 C.F.R. §§ 242.10 and 242.16 (1988)). Third, the right to counsel may be infringed by violating other statutory or regulatory provisions, e.g., denying a change of venue or continuance necessary to permit representation by one's counsel of choice. *See Rios–Berrios*, 776 F.2d at 863; *see also Baires*, 856 F.2d at 93 (denial of continuances and motion to change venue "de-

prived [attorney] of a fair opportunity to prepare his case" and violated petitioner's "statutory right to present evidence"). Finally, it is equally well settled that "[d]enial of these statutory and regulatory rights may constitute an abuse of discretion requiring remand." *Baires*, 856 F.2d at 91; *Castro–O'Ryan*, 847 F.2d at 1312 (same). This much both parties concede.

■ However, the law is less clear, and the parties are divided, on two questions: (1) whether prejudice must be shown when the right to counsel is impinged; and (2) what standard of prejudice controls. The general rule is that an alien must establish prejudice in order to invalidate deportation proceedings on a claim that statutory or regulatory rights were infringed:

> This Circuit has held that a violation of an INS regulation does not invalidate a deportation proceeding unless the regulation serves a purpose of benefit to the alien. *United States v. Rangel–Gonzales*, 617 F.2d 529, 530 (9th Cir.1980). In addition, even if the regulation does serve a purpose of benefit to the alien, a violation of that regulation will not render a deportation unlawful unless the violation prejudiced the interests of the alien protected by the regulation. *Id.* Thus, the violation of an INS regulation will render a deportation unlawful if the regulation in question serves a purpose of benefit to the alien and its violation prejudiced the interests of the alien that it was intended to protect. *Id.*

*United States v. Cerda–Pena*, 799 F.2d 1374, 1377 (9th Cir.1986) (footnote reference omitted). The same rule applies to constitutional due process challenges. *See United States v. Nicholas–Armenta*, 763 F.2d 1089, 1091 (9th Cir.1985).[4]

However, as the *Baires* court emphasized, the right to counsel enjoys special

---

4. Typically, however, the question of constitutional due process is not reached unless the agency conduct and its affect on the alien, are particularly severe. *See Castro–O'Ryan*, 847 F.2d at 1313. This comports with the distinct, but no less important, rule of judicial restraint favoring resolution of cases without reaching constitutional grounds whenever possible. *See Jean v. Nelson*, 472 U.S. 846, 854, 105 S.Ct. 2992, 2997, 86 L.Ed. 2d 664 (1985).

status since it is a right fundamental to the deportation process:

> We have consistently emphasized the critical role of counsel in deportation proceedings. *See Reyes–Palacios v. U.S. I.N.S.*, 836 F.2d 1154, 1155 (9th Cir.1988); *Escobar Ruiz v. INS*, 813 F.2d 283, 292–93 (9th Cir.1987), *aff'd*, 838 F.2d 1020 (9th Cir.1988) (en banc). We have characterized the alien's right to counsel of choice as "fundamental" and have warned the INS not to treat it casually. *Rios–Berrios*, 776 F.2d at 863–64. As we have also said, that right must be respected in substance as well as in name. *Id.* at 863.

856 F.2d at 91 n. 2.[5] Accordingly, the Ninth Circuit has intimated that interference with or denial of the right to counsel may invalidate deportation proceedings even if prejudice cannot be shown. The line of authority begins with *Rios–Berrios*, a case in which the petitioner was moved across the country by the INS and forced to go forward with a deportation hearing just days after arrest, without being advised of his right to counsel and despite his request for time to locate counsel. 776 F.2d at 861. The court held that petitioner's transfer to Florida, "combined with the unexplained haste in beginning deportation proceedings, combined with the fact of petitioner's incarceration, his inability to speak English, and his lack of friends in this country, demanded more than lip service to the right of counsel declared in statute and agency regulations, a right obviously intended for the benefit of aliens in petitioner's position." *Id.* Against the INS's argument that any error on its part was harmless, the court explicitly distinguished *Nicholas–Armenta*, 763 F.2d at

1091 (prejudice required in due process challenge), because "the right to counsel was not involved there," and noted that the Ninth Circuit had not yet decided "whether there must be a showing of prejudice in a case in which counsel has been effectively denied." *Rios–Berrios*, 776 F.2d at 863. Although the *Rios–Berrios* court went on to hold that petitioner had established prejudice, the court warned that it would scrutinize cases involving agency indifference to applicable law:

> We are not in favor of an agency treating the statutes and regulations by which it is governed as casually as it viewed them here. We will continue to take a close look at a claim such as that raised by petitioner, especially where so fundamental a question as right to counsel of one's choice is concerned.

776 F.2d at 863–64.

The Ninth Circuit has returned to the prejudice requirement in subsequent decisions. *See, e.g., Baires*, 856 F.2d at 91 n. 3 ("It is unclear ... whether prejudice must be shown where the statutory right to counsel has been effectively denied"; finding nevertheless that petitioner was prejudiced by interference with right to present evidence through IJ's change of venue and denial of continuance); *Colindres–Aguilar*, 819 F.2d at 262 (same). Most prominently, in *Cerda–Pena*, the court attempted to clarify the hint contained in *Rios–Berrios*:

> *Rios–Berrios* ... contains dicta suggesting that an effective denial of counsel might be considered *per se* prejudicial. The immigration judge in *Rios–Berrios*, after having granted two one-day continuances in order for the alien to obtain representation, proceeded

---

5. See also *Castro–O'Ryan:*

> The importance of counsel for the alien in deportation cases has long been recognized. Over fifty years ago it was observed that in "many cases" a lawyer acting for an alien would prevent a deportation "which would have been an injustice but which the alien herself would have been powerless to stop." National Commission on Law Observance and Enforcement (the Wickersham Commission), REPORT ON THE ENFORCEMENT OF THE

> DEPORTATION LAWS IN THE UNITED STATES 109 (1931). Since 1931 the law on deportation has not become simpler. With only a small degree of hyperbole, the immigration laws have been termed "second only to the Internal Revenue Code in complexity." E. Hull, *WITHOUT JUSTICE FOR ALL* 107 (1985). A lawyer is often the only person who could thread the labyrinth.

> 847 F.2d at 1312.

with the alien's deportation hearing despite clear evidence that the alien needed and desired more time to obtain representation. The current case is distinguishable from *Rios–Berrios* because it does not involve a clear denial of representation. At the deportation hearing, appellant was informed of his right to representation and asked if he wished to proceed without representation.... The appellant does not contend that he did not voluntarily proceed without representation, but argues that he was inadequately apprised of his right to representation and of how that right may be exercised. While recognizing that *an outright refusal to allow an alien the opportunity to obtain representation may be such an egregious violation of due process so as not to require any further showing of prejudice,* this Court believes that an immigration judge's failure adequately to apprise an alien of his or her right to representation should only invalidate the deportation if actual prejudice is shown, as is the case with other violations of INS regulations and due process.

799 F.2d at 1377 n. 3 (emphasis added) (citations omitted). *Cerda–Pena* therefore suggests that if the violation of the right to counsel is sufficiently egregious—i.e., a clear denial of representation or outright refusal to permit an alien to obtain representation—prejudice needn't be shown. Violations short of this threshold, however, are subject to the general prejudice requirement. This is only a suggestion in dicta though—it does not appear that the Ninth Circuit has confronted a case where an egregious violation occurred, and the alien was unable able to show prejudice.

The second issue is what standard of prejudice applies. There is some indication in earlier Ninth Circuit authority that prejudice can be established by showing merely that an alien would have been aided in the deportation process but for the INS's violation of the INA or applicable regulations. *See United States v. Rangel–Gonzales,* 617 F.2d 529, 533 (9th Cir.1980)

("the appellant ... carried his initial burden of going forward with evidence that he did not know of his right to consult with consular officials, that he would have availed himself of that right had he known of it, and *that there was a likelihood that the contact would have resulted in assistance to him in resisting deportation* ") (emphasis added).

In *Cerda–Pena,* however, the court rejected a claim (by an alien who had not been advised of the right to counsel or of his right to contact the Mexican Consul), that the INS's regulatory violations should be assessed under the prejudice standard applied in *Rangel–Gonzales. Cerda–Pena,* 799 F.2d at 1378. The court reviewed *Rangel–Gonzales* and held that, despite the "received assistance" language in the holding, the proper prejudice standard from *United States v. Calderon–Medina,* 591 F.2d 529 (9th Cir.1979), was set forth in an earlier part of the opinion. *Cerda–Pena,* 799 F.2d at 1378–79. The *Calderon–Medina* standard is that:

> On remand the aliens should be allowed the opportunity to demonstrate prejudice from the INS regulation violations. The district courts will determine whether violation of 8 C.F.R. § 242.2(e) *harmed the aliens' interests in such a way as to affect potentially the outcome of their deportation proceedings.* Any such harm should be identified specifically.

591 F.2d at 532 (emphasis added). The *Cerda–Pena* court simply interpreted away the clear implication in *Rangel–Gonzales* that prejudice may be shown even where the outcome of the proceedings may not have changed. *See Cerda–Pena,* 799 F.2d at 1379 ("The court holds that the standard enunciated in *Rangel–Gonzales* requires that an alien produce some concrete evidence indicating that the violation of a procedural protection actually had the potential for affecting the outcome of his or her deportation proceedings."). Thus, according to *Cerda–Pena,* an alien must show that the outcome of his or her depor-

tation proceedings was affected and, absent such a showing, it is apparently irrelevant whether laws designed to protect well-recognized, long-standing interests in fair, informed, impartial proceedings are flouted by the agency.[6]

On the record before this Court, petitioner has no claim of prejudice under the *Cerda–Pena* standard. There is no indication that remanding to the INS for a new removal hearing would produce a different result—petitioner has not pointed to any additional evidence or legal argument that could be made to affect the outcome of his case.[7] Thus the only question is whether the evidence of interference with his attorney-client relationship is so egregious as to be *per se* prejudicial.

On this point, petitioner argues that the Ninth Circuit has been particularly intolerant of INS conduct that interferes with *pre-existing* attorney-client relationships. He cites *Committee of Central American Refugees v. INS*, 795 F.2d 1434 (9th Cir.) ("*CCAR*"), *amended by*, 807 F.2d 769 (1986), for this proposition. The court in *CCAR* held that it would be inappropriate to enjoin transfer of aliens "where movement does not interfere with existing attorney-client relationships." 795 F.2d at 1439. Because the case dealt with aliens who did not have counsel at the time of their transfer, it distinguished the rule applicable where there is a pre-existing attorney-client relationship:

> Where the facts demonstrate that there has been a denial of the privilege to be represented by counsel, we have ordered

new deportation proceedings. *See Castro–Nuno v. INS*, 577 F.2d 577, 579 (9th Cir.1978) (immigration judge abused discretion by failing to continue deportation hearing to allow alien who did not waive statutory right to counsel to locate previously retained counsel who was absent on that day); *Mendez v. INS*, 563 F.2d 956, 959 (9th Cir.1977) (INS' failure to notify alien's previously-retained counsel prior to deporting alien violated alien's statutory right to counsel); *accord Chlomos v. United States Dep't of Justice, INS*, 516 F.2d 310, 313–14 (3d Cir.1975) (notice of impending deportation proceeding should have been given to attorney of record; denial of continuances was abuse of discretion). The key factor present in each of these cases showing a constitutional deprivation is the existence of an established, on-going attorney-client relationship.

*Id.* In both of the Ninth Circuit cases cited by the *CCAR* court, the deportation proceedings were deemed unlawful and overturned *without any specific inquiry or showing that the outcome was affected by the agency's unlawful conduct.* Although outcome-prejudice can be readily inferred from the *Mendez* opinion, 563 F.2d at 957 (alien's underlying criminal sentence reduced below statutory threshold for deportability two weeks before being deported), the court actually cited and appeared to follow the so-called *Accardi* doctrine—a doctrine which rests on a line of authority holding, quite contrary to *Cerda–Pena* and

---

**6.** It is worth noting, in this context, that a vigorous dissent in *Cerda–Pena* contended that the *Rangel–Gonzales* decision was the first case in the Circuit to "fully discuss[ ] the *content* of the prejudice standard" mentioned in *Calderon–Medina*. 799 F.2d at 1381 (emphasis original). The dissent added that, immediately after quoting the *Calderon–Medina* standard, the *Rangel–Gonzales* court focussed in on the assistance the alien would have received but for the violation of his rights, "not on the substance of what that assistance actually would have yielded." *Id.; see Rangel–Gonzales*, 617 F.2d at 530 ("*The prejudice must relate to the interests protected by the regulation.* Since the interests of the alien

protected by this regulation related to obtaining assistance in preparing a defense to the deportation, we must consider whether appellant demonstrated that such interests were materially affected.") (Emphasis added). The dissent in *Cerda–Pena* thus suggests that the majority evaded the real import of the *Rangel–Gonzales* decision.

**7.** Petitioner claims that he might have been released on bond earlier if the motion for change of venue had been granted so that witnesses could have testified on his behalf in San Francisco. However, his release on bond in May of this year moots this issue.

*Calderon–Medina,* that agency conduct in derogation of controlling law is invalid, *regardless of whether the individual subject to the agency's conduct suffered outcome-prejudice thereby.*[8]

In *Castro–Nuno,* moreover, there is no indication whatsoever, that the outcome of the proceeding was affected by the agency's unlawful action. The alien's counsel inexplicably failed to show up for a rescheduled deportation hearing and the IJ proceeded without attempting to contact counsel or granting a continuance. The only injury identified by the court is that the government's witnesses testified without cross-examination by the alien. The court nevertheless held that "the immigration judge's actions amounted to an abuse of discretion.... [T]he immigration judge should have acted *sua sponte* to continue the hearing and give Castro–Nuno a chance to locate his counsel. Without a continuance to bring his counsel into the hearing, Castro–Nuno was effectively denied his statutory right of representation." 577 F.2d at 579. The court then reversed the order of deportation and remanded the case in a manner consistent with the *Accardi* doctrine.[9]

One way to reconcile *Mendez* and *Castro–Nuno,* on the one hand, with *Cerda–Pena* (which fails to cite or discuss these earlier cases), is to assume that the earlier cases represent the type of violation that should be deemed *per se* prejudicial. Another way is to assume that the Ninth

8. *See Accardi v. Shaughnessy,* 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954) (order of deportation vacated where procedure leading to the order failed to conform to applicable regulations). The *Mendez* court emphasized that "[c]ourts have looked with disfavor upon actions taken by federal agencies which have violated their own regulations." 563 F.2d at 959 (citing *Yellin v. United States,* 374 U.S. 109, 83 S.Ct. 1828, 10 L.Ed.2d 778 (1963), for proposition that decisions of an agency made in violation of its own procedures are reversible even in the absence of a due process violation since agencies must obey their own rules). The court went on to quote a Sixth Circuit decision following *Accardi* and *Yellin:* "While courts have generally invalidated adjudicatory actions by federal agencies which violated their own regulations promulgated to give a party a procedural safeguard, we conclude that the basis for such reversals is not, as Bates asserts, the Due Process Clause, but rather a rule of administrative law.... Agency actions in *Yellin v. United States, supra,* and *Accardi v. Shaughnessy, supra,* were reversed for violations of their own regulations, but the court did not rely on the due process clause." *Id.* (quoting *Bates v. Sponberg,* 547 F.2d 325, 330 (6th Cir.1976)). Indeed, in *Mendez,* the Ninth Circuit felt strongly enough about the violation that it reversed and remanded for new proceedings despite the fact that the alien had already been deported out of the country. *Id.*

For a thorough discussion of the *Accardi* doctrine, *see Montilla v. INS,* 926 F.2d 162, 167–70 (2nd Cir.1991) ("The seeds of the *Accardi* doctrine are found in the long-settled principle that the rules promulgated by a federal agency, which regulate the rights and interests of others, are controlling upon the agency."), *clarified and followed in, Waldron v. INS,* 17 F.3d 511, 517–18 (2nd Cir.1993) ("We conclude that when a regulation is promulgated to protect a fundamental right derived from the Constitution or a federal statute, and the INS fails to adhere to it, the challenged deportation proceeding is invalid and remand is required."), *cert. denied,* 513 U.S. 1014, 115 S.Ct. 572, 130 L.Ed.2d 489 (1994).

9. Even the Third Circuit case, which noted that the record contained evidence from which prejudice might be inferred, expressed "misgivings" about the conclusion that prejudice is a prerequisite to relief. *Chlomos,* 516 F.2d at 314. The *Chlomos* case is similar to the case at bar on its facts: (1) the petitioner was arrested by the INS in Florida and deportation proceedings were immediately initiated there despite the fact that a prior order to show cause had been issued in New Jersey where petitioner resided and had retained counsel; (2) the IJ granted two very short continuances because petitioner requested the presence of his attorney but proceeded with the hearing when the attorney did not appear due to the travel distance; and (3) the attorney requested a change of venue which was simply ignored by the IJ. *Id.* at 311–13. On the grounds that notice of the proceeding should have been given to his attorney and that the two continuances were insufficient to afford petitioner access to his attorney, the Third Circuit vacated the order of deportation and remanded the case for new proceedings. *Id.* at 314.

Circuit precedent is simply ambiguous and conflicting on the question whether prejudice must be shown where the right to counsel is involved. Controlling authority points in both directions. Since it is clear, however, that petitioner can meet the higher requirements of the first assumption (i.e., since he suffered a violation which should be considered *per se* prejudicial), the Court need not resolve the apparent conflict, though it is worth noting that this case demonstrates the importance of the *Accardi* doctrine for ensuring agency compliance and procedural accountability.

■ In at least three respects, the record in this case reveals a rather shocking interference with petitioner's attorney-client relationship.[10] First, he was detained and proceedings were initiated against him without notice to counsel who, months beforehand, filed a Form G–28 with the INS specifically requesting that petitioner not be transported out of the area due to their "existing attorney-client relationship." AR 149. In view of the pre-existing relationship and the fact that "it is impossible to maintain attorney-client communication over the telephone" with a mute client, counsel also asked that the INS file the Notice to Appear with the Immigration Court in San Francisco. *Id.* The INS not only disregarded this letter, it failed to inform counsel of petitioner's whereabouts and made no effort to inform counsel once it decided to conduct removal proceedings in Seattle. Instead, counsel discovered petitioner's location on the day his removal hearing was set to begin, well over a month after being taken into detention in California.[11] Moreover, counsel was not given a copy of the Notice to Appear filed in Seattle until August 8, weeks after the initial hearing in Seattle was set to begin, and only at the repeated insistence of the IJ. The record discloses no cooperation or assistance on the part of counsel for the INS in this regard. How

counsel was to consult with and effectively prepare petitioner for his removal hearing with no knowledge of his whereabouts or possession of the charging documents is beyond the comprehension of this Court. *See Mendez*, 563 F.2d at 959 (alien was issued notice to appear for deportation and deported without notice to counsel; holding that "failure to notify appellant's counsel amounts not only to a violation of 8 C.F.R. 292.5(a), but also to appellant's right to counsel as provided in 8 U.S.C. § 1252(b)"). As the Third Circuit held in *Chlomos:*

> Notice of the impending proceeding ... could and should have been given to [petitioner's pre-existing attorney of record]. We disapprove of an administrative agency scheduling a hearing for a person who it knows is represented by counsel without giving reasonable notice to the lawyer. Such conduct is more than simply discourteous; it is unfair. It was particularly aggravating here, where petitioner was incarcerated and under a handicap in communicating with his lawyer.

516 F.2d at 313–14.

Second, although three short continuances were granted by the IJ, nothing was done to overcome petitioner's speech-related difficulty in communicating long-distance with his attorney—an obvious prerequisite to meaningfully preparing for and participating in the hearings. Allowing counsel to "appear telephonically" was woefully inadequate in this regard. There was not enough time to communicate by letter to prepare for the hearings after the Notice to Appear was finally forwarded to counsel, and petitioner had no means of privately conferring with or seeking the advice or opinion of his counsel during the hearings. The confusion worked by these problems is manifest. At the August 13th hearing, petitioner attempted to submit

---

10. Even counsel for the INS conceded at oral argument that this "was not one of the better moments for the process."

11. This is not the first time the INS has been found to have unlawfully engaged in such tactics. *See Orantes–Hernandez v. Thornburgh*, 919 F.2d 549, 565–67 (9th Cir.1990).

papers written in Spanish to the court which may have been confidential attorney-client communication, and it appears that petitioner's counsel had difficulty hearing what was being said over the phone. AR 57–61.

Thus when the IJ asked counsel on August 19th, whether he had an opportunity to review the Notice to Appear with his client, this Court has no confidence that counsel's affirmative response means what it should have meant, namely, that petitioner was properly informed of the nature and consequences of the proceedings and that he discussed, understood and concurred with counsel's contemplated course of action on his behalf. However satisfactory telephonic appearance and written correspondence may be in other proceedings, or where one's client it not mute, it is beyond peradventure that petitioner's counsel here was precluded from representing his client in any meaningful sense of the term. While longer continuances might have solved the preparation problem here, the short continuances granted by the IJ were categorically insufficient. As the Supreme Court has emphasized, "a myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality ...." *Ungar v. Sarafite*, 376 U.S. 575, 589, 84 S.Ct. 841, 849–50, 11 L.Ed.2d 921 (1964), *quoted in Rios–Berrios*, 776 F.2d at 862 (holding that while reviewing courts usually defer to discretion of trial judge in granting or denying a continuance, grant of two short continuances where alien requested time to find a lawyer is an abuse of discretion); *see also Baires*, 856 F.2d at 91 (noting that Ninth Circuit has "remanded a number of cases in which the immigration judge's denial of a continuance, or failure to inquire whether a continuance was needed, resulted in the denial of the alien's right to counsel") (citing *Reyes–Palacios v. U.S.*

*I.N.S.*, 836 F.2d 1154, 1155–56 (9th Cir. 1988); *Colindres–Aguilar*, 819 F.2d at 261; *Rios–Berrios*, 776 F.2d at 863; *Castro–Nuno*, 577 F.2d at 579); *Chlomos*, 516 F.2d at 314 ("While two continuances were granted in this case, as a practical matter, they were inadequate to make the services of his chosen counsel available to petitioner.").

▉ Third, the IJ plainly abused her discretion in denying the motion for change of venue filed by counsel to cure the unlawful effects of the agency's decision to proceed against petitioner in Seattle. As the BIA has held, "[t]he decision whether to grant or deny a motion for change of venue rests solely in the discretion of an immigration judge." *Matter of Velasquez*, 19 I & N Dec. 377, 382, 1986 WL 67716 (BIA April 9, 1986); *accord Matter of Rivera*, 19 I & N Dec. 688, 690, 1988 WL 235426 (BIA August 1, 1988). According to INS regulations, a motion for change of venue may only be granted "for good cause." [12] Six factors are typically considered in assessing whether good cause exists: (1) administrative convenience; (2) expeditious treatment of the case; (3) the location of witnesses; (4) the costs of transporting witnesses and/or evidence to a new location; (5) the INS's interest in proceeding in a particular location; and (6) the alien's place of residence. *See Matter of Rivera*, 19 I & N Dec. at 690; *Matter of Velasquez*, 19 I & N Dec. at 382–83.

In this case, the IJ denied petitioner's motion to change venue on the inference that granting the motion would require an act beyond her discretion insofar as it would effectively force the INS to transfer petitioner to San Francisco. However, the IJ denied the motion the day after it was filed without affording the INS an opportunity to respond and without inquiring

---

**12.** 8 C.F.R. § 3.20(b) provides:

The Immigration Judge, for good cause, may change venue only upon motion by one of the parties, after the charging document has been filed with the Immigration Court.

The Immigration Judge may grant a change of venue only after the other party has been given notice and an opportunity to respond to the motion to change venue.

whether the agency opposed the motion. Instead, it appears that the IJ unilaterally applied her self-proclaimed policy of denying motions for change of venue on the assumption that venue change would automatically require the INS to transfer petitioner. There is no indication that the IJ gave any consideration to factors militating in petitioner's favor and establishing good cause. Especially where an attorney-client relationship pre-dates the alien's detention or transfer to a remote location, the right to representation by counsel of choice is a compelling reason for venue change. *See Rios–Berrios*, 776 F.2d at 863 (transfer to remote location one element in host of agency actions that interfered with statutory right to obtain counsel); *Chlomos*, 516 F.2d at 314 (where petitioner resided, obtained counsel and initially appeared before immigration court in New Jersey, agency's decision to hold deportation hearings in Florida violated right to counsel); *see also Baires*, 856 F.2d at 92–93 (statutory right to present evidence violated where immigration judge denied motion to change venue to place where witnesses were located). Indeed, the right to counsel is so fundamental that it may properly trump other relevant factors. The IJ's failure to even consider this issue in the present case (along with other factors such as petitioner's long residence in California, his health condition, witnesses in California who would have supported his bond motion, and the apparent arbitrariness of the INS's decision to proceed in Seattle), is a clear abuse of discretion.

More fundamentally, the IJ's "policy" is predicated on a false legal premise. While it is true that an IJ cannot order the INS to change the place of detention, *see Matter of Rahman*, 20 I & N Dec. 480, 484, 1992 WL 195808 (BIA May 12, 1992) ("The place of detention is a subject over which the immigration judge has no authority . . . ."), a motion to change venue is analytically distinct from detention since venue concerns only the place where *hearings* in the case shall take place. *Id.* at 484. As the BIA has confirmed, "an order changing venue in a given case does not require the Service to change the place where the applicant is detained." *Id.; see also id.* at 483 n. 4. This is why administrative convenience and the interests of the INS in a particular location are just two of the factors examined when determining whether good causes exists—the agency's financial and logistical interest in holding hearings near the place of detention is not dispositive, but rather must be balanced against other factors under the circumstances of each case. Here the discretion of the IJ over venue motions and her lack of jurisdiction over the agency's detention decisions meet an obligation protected by the statute and designed to ensure the integrity of the entire process. Under these circumstances, an IJ does not exceed her authority if, as a consequence of ordering a change of venue for good cause, the INS decides to transfer the alien to a proximate place of detention.[13] To hold otherwise would render the right to counsel of choice nugatory. Pre-existing counsel could be thwarted whenever the INS chose to proceed in a remote location. Thus the IJ's decision was based on an erroneous conclusion of law.[14]

### III. CONCLUSION

Accordingly, and good cause appearing, the petition for habeas corpus is HEREBY GRANTED as follows: the order of removal is REVERSED and the case is REMANDED to the agency for further proceedings consistent with this opinion.

**IT IS SO ORDERED.**

---

**13.** This raises a fourth defect in the agency's conduct of this case. Given the preexisting attorney-client relationship, petitioner should never have been transferred 800 miles from his counsel in the first place.

**14.** The denial of the motion for reconsideration was equally flawed in this regard.